**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**
_____

JULIAN MORENO,

                   Plaintiff,

      V.                                           Case No. 10-CV-1097 WJ/ACT

TAOS COUNTY BOARD OF COMMISSIONERS,
DEPUTY CARLOS ARCHULETA,
in his individual capacity, DEPUTY PAUL GARCIA,
in his individual capacity,

                   Defendants.

**MEMORANDUM OPINION AND ORDER DENYING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON COUNT II**

THIS MATTER comes before the Court on Defendants Taos County Board of

Commissioners, Deputy Carlos Archuleta, and Deputy Paul Garcia's Motion for Summary

Judgment (**doc. 155**), and Plaintiff Julian Moreno's Motion for Summary Judgment on Count II

– Claim of Unreasonable Force in Use of Taser (**doc. 153**), both filed January 18, 2103.  The

Court finds that neither motion is well-taken and both shall be **DENIED**.

**BACKGROUND**

It is undisputed that on June 13, 2009, Plaintiff was involved in a car accident near a

highway rest stop while under the influence of alcohol and with marijuana and cocaine in his

system.  When police arrived at the scene, he was arrested, handcuffed, and placed in the back of

a police truck while the officers investigated further.  At some point, Defendant Archuleta, a

Taos County Deputy who had responded to the accident, tased Plaintiff at least once.  Defendant

Garcia, also a Taos County Deputy, had also responded to the accident, carried the taser that

Archuleta used on Plaintiff, and assisted Archuleta in the incident.

Beyond this bare narrative, the parties' accounts diverge significantly.  According to Defendants, Moreno's car accident was preceded by a number of disturbances at the rest stop, including Moreno loudly and publicly berating his girlfriend; threatening bystanders by saying he had a gun and would shoot them unless they left him alone; and taking off in his girlfriend's SUV.  When he tried to return to the rest stop, he turned against traffic and collided with another vehicle.  After the accident, Moreno exited the SUV and had to be physically restrained from entering other people's cars; told people that his girlfriend had been driving the car at the time of the accident; and tried unsuccessfully to hit one of the bystanders.  Moreno then tried to escape the scene of the accident by jumping in the back of a pickup truck being driven past.  Two witnesses followed in their own vehicle, convinced the driver to pull over, and removed Moreno from the back of the truck, restraining him until Defendant Archuleta arrived.

Archuleta immediately noticed that Moreno smelled strongly of alcohol and appeared extremely intoxicated.  Moreno also told Archuleta that he had been drinking for three days and was really drunk at that moment.  Archuleta then handcuffed Moreno and took him into custody.  Moreno became irate and used obscene language toward Archuleta.  He was unable to walk properly, and Archuleta had to assist him to the patrol unit, a truck.  During the drive back to the crash scene, Moreno began yelling and insisting he did not know why he was in a police truck.

After arriving at the crash scene, Archuleta left the unit to help other Taos County deputies investigate the crash.  However, Moreno began yelling and hitting his head repeatedly on the steel cage separating the front and rear seats in the patrol truck.  Archuleta returned to the unit, opened the door, and told Moreno to stop hitting his head.  Moreno continued to do so and yelled obscenities.  Archuleta shut the door and attempted to continue the investigation.  Soon

2

after, Moreno again began beating his head against the cage and yelling.[1]  Archuleta and Garcia opened the door and asked Moreno to stop.  A third deputy, Eugene Holgate, was also present at the patrol unit.  At this point, Moreno started kicking at the deputies and spitting on Garcia.[2] Archuleta asked Moreno one more time to stop, and Moreno refused.

In response, Archuleta took a taser from Garcia's duty belt and warned Moreno that he would be tased if he did not stop engaging in such behavior.  Moreno continued to kick and spit. Archuleta then engaged the taser in drive-stun mode[3] and tased Moreno on his right shoulder for approximately three seconds.  After being tased, Moreno said that he would behave, and he stopped shouting and banging his head.  He was transported first to a local hospital, where he refused treatment, and then to the Taos Adult Detention Center.

Moreno accounts for the events differently.  In his complaint, he does not address the details surrounding the accident.  At his deposition, however, he denied (1) telling bystanders he had a gun and would shoot them; (2) trying to climb into people's cars; (3) telling bystanders he had not been driving the car during the accident; or (4) trying to hit any of the bystanders.  He also explained that he had tried to escape in the pickup truck because he was afraid that the

---

[1] Defendants' account of the facts alleges both that Moreno had continued hit his head and yell obscenities after being told to stop the first time, and that he later began to beat his head and yell again.  The Court therefore presumes Moreno had ceased misbehaving at some point after the first warning, and then resumed.

[2] The truck in question had an extended cab affording a very small space for seating behind the front seats.  Access to the rear seating required opening first the passenger side door, then opening a smaller half-sized door.  The deputies describe Moreno as sitting in the rear, facing the passenger side door, and banging the left side of his head against the steel cage.  When they opened the rear door, Moreno was therefore facing the deputies and tried to kick them by kicking his legs forward. The size of the rear seating made it difficult for the deputies to access the space to restrain Moreno.

[3] Tasers operate in two possible modes.  In "dart mode," the taser is loaded with a cartridge and fires two barbs at the subject.  The barbs penetrate a subject's clothing or skin, and remain attached to the taser by thin wires 15 to 35 feet in length.  The device then delivers high voltage, low current electricity through the subject's muscles, causing temporary loss of control of those muscles, or "Neuromuscular Incapacitation" ("NMI").  This temporary incapacitation allows officers to approach and subdue a suspect.  In "drive stun mode," the taser cartridge containing the barbs and wires has been either removed or already discharged.  The user applies the taser probes directly to the subject, which causes pain at the site of contact, but does not cause NMI.  Pain continues only as long as the taser is in direct contact with the subject.  Defs.' Resp. to Pl.'s Mot. for Summ. J., Ex. 2 (doc. 161-2, at 2). It is undisputed that the taser here was used only in drive-stun mode.

crowd of bystanders were going to assault him or push him into the highway, and that the driver gave him permission to get in the truck.

According to Moreno, when Archuleta arrived at the location where Moreno had been restrained, he placed Moreno in handcuffs, escorted him to the patrol unit, and placed him in the backseat. Archuleta knew immediately that Moreno was under the influence of alcohol or high on drugs, and had to assist Moreno in walking to the car. However, Moreno denies becoming irate and yelling at Archuleta while driving back to the crash scene. He also denies hitting his head against the steel cage of the truck, kicking at the deputies, or spitting on the deputies. Instead, he states that when he was put in the back of the truck, he could not move his feet because he was handcuffed, wearing a seat belt, and there was no room to move his feet. He also states that once they arrived at the scene and parked, Archuleta left Moreno handcuffed in the back of the truck while he investigated the crash. Archuleta then returned with Garcia and Holgate, both of whom stood around Archuleta like a shield. Archuleta took a taser from Garcia's belt and tased Moreno three times – once, after rolling up Moreno's pant leg, on the right leg; once, after lifting Moreno's shirt, on his right side near his sternum; and once on the right side of his throat. As a result of the tasing, Moreno had a seizure, vomited, foamed at the mouth, and bit his tongue. He felt like Archuleta was going to kill him, and like he was going to die. He then blacked out.

When he came to, he was in the parking lot of the Taos Adult Detention Center, twitching uncontrollably. Archuleta threatened him by saying, "Listen here you Son of a Bitch, if you make me go to the hospital with you and ruin my plans for tonight then you will have more charges then [sic] you can ever imagine. That's if you ever get out of jail." Compl., Ex. A at ¶ 29 (doc. 1-1, at 3). Archuleta then hit Moreno with either his hand or an object, and Moreno

felt his head snap to the side and saw a bright flash.  Archuleta also ripped a necklace off Moreno's neck, and tightened Moreno's handcuffs so that they caused visible lacerations.

As a result of this experience, Moreno alleges, he has been diagnosed with Post Traumatic Stress Disorder, head injury, hearing and vision loss, depression, anxiety, headaches, chest pain, weight loss, as well as multiple bruises, burns, and abrasions resulting from the incident.  He filed a complaint alleging three counts: I – battery; II – unreasonable seizure and excessive force in violation of his Fourth Amendment rights; and III – negligent hiring, training, and supervision.  He has moved for summary judgment on Count II, alleging use of excessive force in violation of his Fourth Amendment rights.  In turn, Defendants have moved for summary judgment on all claims, on the grounds that Archuleta and Garcia are entitled to qualified immunity on Plaintiff's Constitutional claim, and that the remaining claims derive entirely from the excessive force claim.

## LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(c); *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009).  The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case.  Once that burden is met, the nonmoving party must put forth specific facts showing that there is a genuine issue of material fact for trial; he may not rest on mere allegations or denials in his own pleadings. *Anderson v. Liberty Lobby*, 477 U.S. 242, 256-57 (1986).  In order to avoid summary judgment, the nonmoving party must put forth enough evidence that a

reasonable jury could return a verdict in the nonmovant's favor.  *Id.* at 249.  A mere scintilla of evidence in the nonmovant's favor is not sufficient.  *Id.* at 252.

When a government official raises the defense of qualified immunity in a motion for summary judgment, the plaintiff must produce facts sufficient to show both that defendant's alleged conduct violated the law and that the law was clearly established when the alleged violation occurred.  *Bruning v. Pixler*, 949 F.2d 352 (10th Cir. 1991).  Only then must defendant bear the usual summary judgment movant's burden of showing that no material issues of fact remain that would defeat claim of qualified immunity.  *Id.*; *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (if plaintiff succeeds in carrying his two-fold burden of production, the burden shifts back to the defendant and the analysis reverts to a traditional summary judgment analysis). Courts have discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Id.*

## DISCUSSION

## I.      Defendants' Motion for Summary Judgment

### A.      *The Fourth Amendment Governs the Excessive Force Claim*

As a threshold matter, Defendants dispute which constitutional standard should govern claims of excessive force occurring where, as here, a suspect has already been arrested and is in custody, but has not yet been arraigned or taken to a law enforcement facility.  They argue that although the Tenth Circuit has previously held that the Fourth Amendment's "objective reasonableness" standard governs, this Court should find that the Tenth Circuit has now adopted a Fourteenth Amendment standard, or, at the least, that the law is unsettled.  The Court addresses this argument to clarify the issues to be determined at trial, and concludes that the Fourth Amendment standard applies.

6

In *Graham v. Connor*, the United States Supreme Court made clear that the Fourth Amendment's protection against unreasonable searches and seizures applies to excessive force occurring during or incident to an arrest.  490 U.S. 386, 394-95 (1989).  Similarly, the Court recognized that "the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment."  *Id.* at 395 n.10 (citing *Bell v. Wolfish*, 441 U.S. 520, 535-39 (1979)).  However, the *Graham* Court stopped short of addressing "whether the Fourth Amendment continues to provide individuals with protection against the deliberate use of excessive physical force beyond the point at which arrest ends and pretrial detention begins."  *Id.*

In the wake of *Graham*, as Defendants correctly describe, the Courts of Appeals have split.  A number of Circuits hold that "the Fourth Amendment applies until an individual arrested without a warrant appears before a neutral magistrate for arraignment or for a probable cause hearing or until the arrestee leaves the joint or sole custody of the arresting officer or officers." *Aldini v. Johnson*, 609 F.3d 858, 867 n.6 (6th Cir. 2010) (collecting cases); *see Wilson v. Spain*, 209 F.3d 713, 715–16 (8th Cir. 2000); *Pierce v. Multnomah County*, 76 F.3d 1032, 1042–43 (9th Cir. 1996); *Powell v. Gardner*, 891 F.2d 1039, 1044 (2d Cir. 1989); *McDowell v. Rogers*, 863 F.2d 1302, 1306–07 (6th Cir.1988).  Under this standard, any use of force that is not "objectively reasonable" violates a plaintiff's Fourth Amendment Rights.  *Aldini*, 609 F.3d at 865.

Other Circuits apply the Fourteenth Amendment's guarantee of substantive due process to pretrial detainees' excessive force claims.  *See, e.g.*, *Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996) ("Claims involving the mistreatment of arrestees or pretrial detainees in custody are governed by the Fourteenth Amendment's Due Process Clause . . ."); *Riley v. Dorton*, 115 F.3d 1159, 1162-63, 1166 (4th Cir. 1997), *abrogated on other grounds by Wilkins v. Gaddy*, 599 U.S. 34 (2010) (same); *Wilkins v. May*, 872 F.2d 190, 195 (7th Cir. 1989) (same).  Under this

standard, any use of force that "is so beyond the norm of proper police procedure as to shock the conscience" violates a plaintiff's Fourteenth Amendment rights.  *Wilkins*, 872 F.2d at 195.[4]

However, Defendants' argument that the Tenth Circuit has not reached a clear conclusion on this issue is unpersuasive.  In 1991, the Tenth Circuit held that "just as the fourth amendment's strictures continue in effect to set the applicable constitutional limitations regarding both duration (reasonable period under the circumstances of arrest) and legal justification (judicial determination of probable cause), its protections also persist to impose restrictions on the treatment of the arrestee detained without a warrant."  *Austin v. Hamilton*, 945 F.2d 1155, 1160 (10th Cir. 1991) *abrogated on other grounds by Johnson v. Jones*, 515 U.S. 304 (1995) (citing *Powell v. Gardner*, 891 F.2d 1039, 1044 (2d Cir. 1989) ("We think the Fourth Amendment standard probably should be applied at least to the period prior to the time when the person arrested [pursuant to a warrant] is arraigned or formally charged, and remains in the custody (joint or sole) of the arresting officers.")).  The *Austin* plaintiffs, who were stopped crossing the border into the United States from Mexico, alleged that they were detained for twelve hours in a port of entry office and repeatedly assaulted and otherwise mistreated, before being released without charge.  *Id.* at 1157.  The Tenth Circuit ruled that because the Fourth Amendment governed claims of excessive force against a detained arrestee, at issue was whether

---

[4] The Court notes that even courts adopting the Fourteenth Amendment standard apply it only to claims of excessive force occurring at some time after the initial arrest, usually at a law enforcement facility and not at the scene of the offense, and thus to facts not analogous to this case.  *See, e.g.*, *Riley v. Dorton*, 114 F.3d 1159, 1161 (4th Cir. 1997) (finding significant that the actions took place "at least two hours and ninety miles from the time and place of [plaintiff]'s arrest"); *Bros. v. Klevenhagen*, 28 F.3d 452, 455056 (5th Cir. 1994) (claim of excessive force occurring during a pretrial detainee's transport between two detention facilities, where plaintiff had been "arrested earlier in the day, been processed by the . . . Police Department, and had spent several hours in jail"); *Wilkins v. May*, 872 F.2d 190, 191 (7th Cir. 1989) (claim of excessive force occurring during interrogation of a plaintiff who had been arrested, "taken to the local police station and placed in a cell," and "[l]ater that day . . . taken to an interrogation room"); *Valencia v. Wiggins*, 981 F.2d 1440, 1443-45 (5th Cir. 1993) (recognizing that when a Fourth Amendment seizure ends and detention governed by the Fourteenth Amendment begins is not always clear, but concluding resolution of the issue was not necessary to hold that the Fourth Amendment did not apply to an incident occurring three weeks after the initial arrest).  None of these cases address police actions undertaken at the scene of the offense and arrest.

the officials' use of force was objectively reasonable.  *Id.* at 1160; *see also Barrie v. Grand Cnty., Utah*, 119 F.3d 862, 866 (10th Cir. 1997) (citing *Austin* to support the proposition that the Fourth Amendment "bars the use of excessive force during a period of detention immediately following arrest and before the person is taken before a magistrate judge, or other judicial official, to determine whether the arrest and continued detention were based on probable cause").

Defendants argue that *Becker v. Kroll*, a 2007 case, calls into question the Tenth Circuit's adoption of the Fourth Amendment standard for detainees' excessive force claims.  494 F.3d 904, 915-16 (10th Cir. 2007).  However, the facts in *Becker* are entirely dissimilar to the facts here.  The *Becker* plaintiff had never been arrested, incarcerated, or otherwise placed under state control.  Rather, after being baselessly prosecuted for Medicare fraud, she brought a § 1983 claim alleging that the prosecution constituted a seizure under the Fourth Amendment.  The Tenth Circuit rejected this argument, holding that the Fourth Amendment could not apply because the plaintiff had never suffered a deprivation of liberty sufficient to constitute a seizure. *Id.* at 915.  Concluding that the Fourth Amendment does not apply to a plaintiff who never suffered a seizure holds no implications for whether the Fourth Amendment applies to a plaintiff who was seized.  Further, Defendants argue that because the *Becker* court rejected the Fourth Amendment standard, the Fourteenth Amendment must necessarily apply.  In fact, the *Becker* court concluded that neither standard applied to the facts at hand.  *Id.* at 918 ("[N]o § 1983 claim will arise from filing criminal charges without probable cause under the substantive due process protections of the Fourteenth Amendment.").  Finally, in 2010 the Tenth Circuit again cited *Austin* in support of the proposition that "the Fourth Amendment applies until formal charges are brought or an arraignment is held because force used is part of the 'seizure.'" *Porro v. Barnes*,

624 F.3d 1322, 1325 (10th Cir. 2010).[5]  Therefore, this Court finds that clearly established Tenth

Circuit law holds that the Fourth Amendment governs claims of excessive force occurring while

a suspect is in police custody, and has not yet been brought before a magistrate judge or other

judicial official for arraignment.

       B.       *Under the Fourth Amendment, the Law Is Clearly Established*

Defendants next argue that even if the Fourth Amendment standard applies here, they are

entitled to qualified immunity because the law regarding the use of a taser set to drive-stun, as

opposed to a taser used in dart mode, is not clearly established.  They contend that because there

are no United States Supreme Court or Tenth Circuit cases predating the incident at issue

involving the use of a taser set to drive-stun against an arrestee, Defendants could not have been

on notice that their behavior violated Moreno's constitutional rights.  However, as Plaintiff

points out, "[t]o be established clearly . . . there is no need that 'the very action in question [has]

been previously held unlawful.'"  *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 377

(2009) (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999).  Further, " 'officials can still be on

notice that their conduct violates established law . . . in novel factual circumstances.'"  *Id.* at 378

(quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).  Taking the facts in the light most favorable

to Plaintiff, Defendants are essentially arguing that because no case addresses the use of a taser

set in drive-stun mode against an arrestee, therefore the deputies were not on notice that it was

objectively unreasonable to tase a docile, compliant suspect, immobilized by handcuffs and the

small space in which he had been placed.  The Court finds such a conclusion strains credulity.

---

[5] In *Porro v. Barnes*, the Tenth Circuit proceeded to apply a Fourteenth Amendment standard to the case at hand, which addressed excessive force allegedly used against a federal immigration detainee after he had been in detention for three weeks.  624 F.3d 1322 (10th Cir. 2010).  Thus, the Court only applied the Fourteenth Amendment standard to facts unlike those at issue here.

The Court acknowledges that, as Defendants assert, Moreno's various accounts of the events are inconsistent. However, such inconsistencies properly go to his credibility, not whether the claim survives summary judgment, and assessing credibility is the responsibility of the fact-finder. The jurors may decide not to credit Moreno's testimony, but that is their prerogative, and not one that this Court may usurp.

      C.     *Summary Judgment for the Defendants Is Not Merited on Moreno's Claim of Being Hit by Archuleta*

Defendants also move for summary judgment on the issue of Archuleta allegedly striking Moreno in the parking lot, arguing that Moreno offers no evidence that this event occurred. According to records from Moreno's evaluation at the hospital the night of the incident, Moreno made no complaint of being hit on the head, had no signs of any head trauma, and exhibited no objective symptoms of a concussion. However, the Tenth Circuit has rejected a de minimus exception to the use of force by police officers, and concluded that "proof of physical injury manifested by visible cuts, bruises, abrasions or scars is not an essential element of an excessive force claim." *Cortez v. McCauley*, 478 F.3d 1108, 1129 n.24 (10th Cir. 2007). Any force that is "wholly unnecessary to carry out the arrest" is excessive force, regardless of whether it causes visible injury. *Grass v.* Johnson, 322 Fed. App'x 586, 589 (10th Cir. 2009). Taking the facts in the light most favorable to Plaintiff, a reasonable juror could find that Archuleta struck Moreno, the blow left no marks, and the blow was unnecessary to carry out the arrest. It is true that Moreno's accounts of the blow are inconsistent, but as with his accounts of the tasing, any inconsistencies go to his credibility, which is determined by the jury.

Accordingly, Defendants' Motion for Summary Judgment is DENIED.

## II.    Plaintiff's Motion for Summary Judgment on Count II

Plaintiff has filed a motion for summary judgment on Count II – Claim of Unreasonable Force in Use of a Taser.  He argues that as a matter of law, Archuleta's use of the taser constituted excessive force.  Determining whether a law enforcement official's use of force is objectively unreasonable requires "careful attention to the facts and circumstances of each particular case." *Graham*, 490 U.S. at 396.  The Supreme Court has identified three factors courts should consider, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

Because the material facts of this case are contested, this Court cannot conclude that under these three factors, the use of force against Moreno was objectively unreasonable.  It is undisputed that Moreno was not actively resisting arrest or attempting to evade arrest, as he was already in custody.  It is likewise undisputed that Moreno had been engaged in a serious offense, driving under the influence and causing an accident that injured other motorists.  However, the parties hotly dispute whether Moreno posed an immediate threat to himself or the officers on the scene, and no resolution of this case as a matter of law can be reached without putting that issue before the jury.

Plaintiff's series of cases holding that tasing a suspect constituted excessive force do not compel a contrary conclusion, because the "objectively reasonable" standard is fact-specific and the facts and circumstances of Plaintiff's cases differ significantly from the facts here.  For instance, Plaintiff argues that Archuleta's use of force was excessive as a matter of law because the Tenth Circuit has held that "a detainee's mental health must be taken into account when considering the officers' use of force . . . under *Graham*," and at the time of the incident, Moreno suffered from diminished capacity from intoxication. *Giannetti v. City of Stillwater*, 216 Fed.

App'x 756, 764 (10th Cir. 2007).  However, the line of cases Plaintiff identifies involve suspects suffering from psychiatric and emotional disturbances, not intoxication.  *See id.* (bipolar disorder and multiple previous psychiatric admissions); *see also Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 904 (6th Cir. 2004) ("mentally ill or retarded" suspect diagnosed with autism); *Abdullahi v. City of Madison*, 423 F.3d 763, 772 (7th Cir. 2005) (PTSD causing episodes of disorientation and erratic behavior); *Drummond v. City of Anaheim*, 343 F.3d 1052, 1058 (9th Cir. 2003) (bipolar disorder and schizophrenia); *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001) ("emotionally disturbed" suspect who behaved erratically and had "lost control of himself").  Further, diminished capacity does not itself render the use of a taser on the suspect excessive force.  *See Giannetti*, 216 Fed. App'x at 766 (despite officers' knowledge of suspect's mental health issues, "we cannot conclude that the officers used excessive force given the 'tense, uncertain, and rapidly evolving' situation' in response to suspect's 'escalating opposition'") (citing *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 593 (7th Cir. 1997)).

Similarly, Plaintiff cites cases to support the proposition that "an officer should hesitate to deploy a Taser when the subject is incoherent and he does not appear to understand the officers' commands."  Pl.'s Mot. for Summ. J. (doc. 153), at 8 (citing *Bryan v. MacPherson*, 630 F.3d 805, 812 (9th Cir. 2010); *Estate of Mathis v. Kingston*, 2009 WL 1033771 (D. Colo. 2009); *Cardall v. Thompson*, 845 F. Supp.2d 1182 (D. Utah, 2012)).  However, there is no evidence here that Moreno was incoherent or did not understand Archuleta's commands.  Although Moreno was clearly intoxicated and needed help walking to the police car, there is no evidence, including in his own statements and deposition testimony, that he did not understand what was going on around him or that Archuleta should have perceived that Moreno did not understand.

13

Further, the majority of these cases address the use of a taser in dart mode, not drive-stun mode. *See Cavanaugh v. Woods Cross City*, 625 F.3d 661, 663 (10th Cir. 2010) (when tased, the plaintiff, "whose feet were on the front steps of her home, went rigid, spun around, and struck her head on the concrete steps"); *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1280 (10th Cir. 2007) (the taser used "shoots wire-attached hooks and can deliver a shock for up to five seconds").

Finally, the Court also rejects Plaintiff's argument that he is entitled to summary judgment on this claim based on internal police policies and manufacturer warnings.  Plaintiff alleges that Archuleta violated a Taos County Sheriff's Department policy stating that a taser "shall not be used against . . . [A] HANDCUFFED SUBJECT; OR SUBJECTS DETAINED IN A POLICE VEHICLE."  Pl.'s Mot. for Summ. J. Ex. B. at 2 (doc. 153-4, at 2).  However, the Tenth Circuit has concluded that whether an "arrest violated police department procedures does *not* make it more or less likely that the arrest implicates the Fourth Amendment, and evidence of the violation is therefore irrelevant."  *Giannetti v. City of Stillwater*, 216 Fed. App'x 756, 766 (10th Cir. 2007) (emphasis in original) (quoting *Tanberg v. Sholtis*, 401 F.3d 1151, 1164-64 (10th Cir. 2005).  Moreover, the policy here is dated April 30, 2010, almost a year after the incident at issue.  And although the Plaintiff points to warnings by the manufacturer that tasing a suspect suffering from excited delirium poses a risk of death, there is no evidence that Moreno was suffering from excited delirium.  Therefore, Plaintiff's argument is unavailing.

Accordingly, Plaintiff's Motion for Summary Judgment on Count II is DENIED.

## CONCLUSION

For the foregoing reasons, the Court hereby **DENIES** Plaintiff's Motion for Summary Judgment on Count II – Claim of Unreasonable Force in Use of Taser (**doc. 153**) and Defendants' Motion for Summary Judgment (**doc. 155**).

**SO ORDERED.**

_____
UNITED STATES DISTRICT JUDGE